## GENERAL ELECTRIC CO. v. DE FOREST RADIO CO. et al.*

Circuit Court of Appeals, Third Circuit.
September 18, 1928.

On Petition for Rehearing, November 23, 1928.

No. 3654.

Buffington, Circuit Judge, dissenting in part.

Howson & Howson, of New York City, and William G. Mahaffy, of Wilmington, Del. (Charles Neave and Hubert Howson, both of New York City, and Albert G. Davis, of

*Certiorari denied 49 S. Ct. —, 73 L. Ed. —.

Schenectady, N. Y., of counsel), for appellant.

Thomas G. Haight, of Jersey City, N. J., Samuel E. Darby, Jr., of New York City, and E. E. Berl, of Wilmington, Del., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. General Electric Company, plaintiff below, appeals from a decree of the District Court dismissing its bill of complaint for infringement of United States letters patent No. 1,082,933 issued to it on December 30, 1913, as assignee of William D. Coolidge, the inventor, for "tungsten and method of making the same for use as filaments of incandescent electric lamps and for other purposes." The bill charges that the De Forest Radio Company, a manufacturer of radio tubes, and the Roblen Piano Company, one of its retail distributors, infringed the product claims 24, 26, 27, 28, 33 and 34 of the patent by using and selling drawn tungsten wire as the filamentary cathodes of their vacuum tubes and further that the De Forest Company was guilty of contributory infringement of the process claims of the patent, Nos. 1 to 23 (8, 13 and 15 excepted), in the manufacture of such wire for that purpose. Aside from the defense of noninfringement the defendants attacked the validity of the patent from many angles. The court found all claims in suit void.

As it is not permissible, even were it possible, to state in a judicial opinion the broad subject to which the patent in suit is directed and review its scientific and mechanical development, we shall address this discussion to those who know tungsten and are conversant with its metallurgy and with the litigation which, both at home and abroad, has followed its entrance and advance in the arts. For purposes of the present litigation the subtle features of the subject are sufficiently revealed by the discussions and the many cases cited in the opinions in Desmond Incandescent Lamp Co. v. General Electric Co. (C. C. A.) 27 F.(2d) 590; in the instant suit before the district court, 17 F.(2d) 90; and particularly in General Electric Co. v. Independent Lamp & Wire Co., 267 F. 825, where the same court held valid the same claims which later in the suit at bar it held invalid.

In doing this unusual thing the District Court did not reverse itself within the ordinary understanding of that term by deciding first one way and then the other way on the same facts but consistently arrived at differ-

ent judgments on radically different records. The Independent Case was based on the belief long held by scientists and those active in the lighting art that tungsten is in nature highly brittle and therefore not capable of being drawn into wire and on the plaintiff's contention supported by evidence ample to sustain the finding that Coolidge took the brittle element of nature and by his process converted it into an entirely new metal with the alien characteristics of great ductility and high tensile strength and thereby rendered it capable of being drawn into wire and the wire used for filaments in incandescent electric lamps and radio vacuum tubes. Seemingly ductile tungsten was a chemical paradox. Hence it was there claimed that the metal obtained by the Coolidge process is not pure tungsten but is something else which had been created not by nature but by Coolidge. If this were true, clearly Coolidge was an inventor of high order and was entitled to the reward of a patent for the product which he brought into existence. But it developed in the instant case that while oxid of tungsten ($WO_3$), the form in which tungsten usually exists and is found in the earth, is highly brittle, it was known by many at the time the Independent Case was on trial and is now conceded by every one that pure tungsten, or tungsten substantially pure, is not brittle at all but on the contrary is highly ductile. On evidence of that fact, when brought to the mind of the District Judge for the first time in this case, he disregarded his previous ruling on a record now manifestly erroneous and entered the decree here on appeal holding the product claims invalid because they cover an element of nature with characteristics which nature alone has given it.

The plaintiff in this its second suit on the Coolidge patent no longer maintains, if we understand its position correctly, that pure tungsten is brittle but still contends, however, that the product of the patent with its high ductility is a new metal created by Coolidge and therefore, as a manufacture, is a proper subject-matter for product claims of a patent. The position of the defendants is of course diametrically opposite.

■ In these opposing positions of the parties there is drawn a sharp issue as to precisely what is the subject-matter of the patent, namely: Whether the tungsten of which the patent speaks is the tungsten of nature with its inherent quality of ductility or is a new metal produced by Coolidge which is wholly different from anything that nature provides. If it is a natural thing then clearly, even if Coolidge was the first to uncover it and bring it into view, he cannot have a patent for it because a patent cannot be awarded for a discovery or for a product of nature, or for a chemical element. United States Industrial Chemical Co. v. Theroz Co. (C. C. A.) 25 F.(2d) 387. If it is not a natural thing but is a thing which Coolidge created possessing characteristics different from those given by nature, like dolomite, adamite, and carborundum, Baker Co. v. Kennedy Refractories Co. (C. C. A.) 253 F. 739; Pittsburgh Iron & Steel Co. v. Seaman-Sleeth Co. (C. C. A.) 248 F. 705; American Adamite Co. v. Mesta Machine Co. (C. C. A.) 18 F. (2d) 538; Electric Smelting & Aluminum Co. v. Carborundum Co. (C. C.) 83 F. 493, 499, he is without doubt entitled to a patent for it. Therefore it is manifest that we must at the very outset find one or the other of these contentions as a fact and adopt it as a premise on which to base a proper conclusion. As they are wholly opposite and do not overlap, one must be wholly accepted and the other wholly rejected.

■ True, while Coolidge in his patent application described the product as a new metal he did not ask for a patent for a new metal —a new composition of matter—or describe it as such in the patent claims as the inventors in the dolomite and adamite patents did (supra). From the specification disclosures it appears that "starting with tungstic oxid ($WO_3$)" he "purified" it in a gas furnace for a given time in order to "free it from oxygen, carbon and other impurities" and then in the next operation he subjected the purified tungstic oxid to electric heating for a given period at a temperature within given ranges, stating: "In this operation the tungstic oxid, or as it is called the 'yellow oxid,' is progressively reduced to the blue oxid and then to the brown oxid and then to the *pure metal.*" It is then molded and worked in the manner described. This in substance is what Coolidge says in his specification in respect to the metal. In saying it is "the pure metal," we think he meant tungsten pure for he so describes it in claim 26: "Substantially pure tungsten having ductility and high tensile strength." And also in claim 28: "A form of tungsten metal pliable at room temperature." Tungsten thus described is the tungsten of nature. Moreover, Coolidge applied for and his assignee was awarded a patent for "tungsten."

Coolidge took tungsten as it "existed" ($WO_3$) or as it is found in the earth, its native abode, and by his process converted it into pure tungsten or tungsten that is substantially pure, and, doubtless, was first to discover that when pure it has characteristics,

notably those of ductility and high tensile strength, which are wholly different from the characteristics of the impure oxid of tungsten, notable among which is extreme brittleness. What he produced by his process was natural tungsten in substantially pure form. What he discovered were natural qualities of pure tungsten. Manifestly he did not create pure tungsten, nor did he create its characteristics. These were created by nature and on that fact finding the reasoning as to the validity of the product claims will be based.

The product claims in suit are six in number: They read as follows:

"24. A wire formed of ductile tungsten."

"26. Substantially pure tungsten having ductility and high tensile strength.

"27. A ductile tungsten wire having a fibrous structure."

"28. A form of tungsten metal pliable at room temperature."

"33. The material wrought tungsten, having a specific gravity of approximately 19 or greater, and capable of being forged and worked.

"34. Wrought tungsten, a solid coherent material characterized by the presence of crystals deformed by mechanical working."

Because of the difference in the subjects-matter of the claims, the first four were referred to throughout the litigation as ultimate product claims; the last two as intermediate product claims.

Of the ultimate product claims the broadest, perhaps, is claim 26: "Substantially pure tungsten having ductility and high tensile strength." This claim may be divided into two parts, the subject-matter and a description of the subject-matter. The first, the subject-matter of the claim, is "substantially pure tungsten." That is what the patentee by the claim asserts that he invented.

Naturally we inquire who created pure tungsten. Coolidge? No. It existed in nature and doubtless has existed there for centuries. The fact that no one before Coolidge found it there does not negative its origin or existence.

The second part of the claim reads: "Having ductility and high tensile strength." Did Coolidge give those qualities to "substantially pure tungsten"? We think not for it is now conceded that tungsten pure is ductile cold. If it possesses that quality now it is certain that it possessed it always. Therefore the second part of the claim is merely a correct description of the first part and the first part broadly claims as an invention a product of nature in the form of a chemical element for which a product claim as distinguished from a process claim cannot be validly awarded.

Claim 28—"a form of tungsten metal pliable at room temperature"—is but another way of claiming and describing what was claimed but differently described by claim 26.

For the reasons stated, supplemented by the more extended discussion given by the learned District Judge, we hold product claims 26 and 28 invalid.

The controversy as to the product claims centered on claim 24: "A wire formed of ductile tungsten." This claim, like the first two, may be divided into two parts, (1) subject-matter, namely, "a wire"; and (2) a description of the wire, namely, "formed of ductile tungsten." Looking at it closely, this claim is for a wire made of a metal in nature which when substantially pure is naturally ductile. As we have held the claims covering this product of nature invalid, claim 24 is reduced to invention of a wire made of an article which when purified is free to the world. But a wire made of tungsten is immensely useful, particularly in the electric lighting and radio arts. We think the merit of such a product resides not in its form, namely, a wire, but in the material out of which it is made. A review of the many cases cited in the three cases to which attention was directed at the opening of this discussion will disclose that years ago the value of tungsten as a great electric lighting medium was known throughout the scientific world. Without reciting the highly interesting history of this wonderful metal it will be enough to say that Just and Hanaman by their patent No. 1,018,502, having an effective date of November 4, 1904 (which was long before any date claimed by Coolidge), disclosed the use of tungsten as a filament for an incandescent lamp and how to make a wire or rod of tungsten in a coherent metallic state, homogeneous throughout. With this invention the electric lighting art made amazing strides amounting almost to a romance, colorfully told by this plaintiff in its records and briefs in the group of cases recently heard by this court and headed by the Independent Lamp & Wire Company Case, supra, the last of a long line of cases in other jurisdictions brought to enforce the Just and Hanaman and Langmuir patents. But the Just and Hanaman filament, though having the appearance of a wire, was more of a rod, for it was not drawn but was made, squirted, or pressed into shape. It was fragile and therefore not so serviceable as a wire drawn from ductile tungsten.

When Coolidge came along with his in-

vention showing how to produce pure tungsten with its native quality of ductility cold, the electric lighting art made still further advances and on it the radio art was in a measure founded. The point in this discussion is, generally, that the uses of tungsten in wire form were long known before Coolidge, and, particularly, that Coolidge was not the first to use tungsten as a filament and that his use of tungsten for that purpose was not invention. Many scientists, notably Just and Hanaman, were before him in that. But as wire of substantially pure tungsten is by reason of its qualities of ductility, bendability and high tensile strength so much better as a filament than the tungsten rod of Just and Hanaman some have thought that invention, as stated in claim 24, resides in the wire and this because "tungsten wire" seemingly conforms to a more or less imperfect definition of invention. Clearly "tungsten wire," that is, drawn tungsten, was new with Coolidge. There is no question that tungsten in wire form is useful, immensely so. Nor is there doubt that the tungsten filament art had come to a standstill with Just and Hanaman and made its next advance through Coolidge and that this advance was tremendous. There are thus many elements of invention in what Coolidge did but we should be careful to distinguish between the several things he did and accord invention only to the proper thing and the thing through which the art made its advance, and that, we think, was the method he disclosed for producing substantially pure tungsten, not the drawing of pure tungsten, once obtained, into a wire. Given the knowledge of the art and particularly the disclosures of Just and Hanaman as to the advantages of a tungsten filament and given pure tungsten with its natural characteristics of great ductility and high tensile strength, the drawing of such tungsten into a wire for filament purposes was obvious. In this judgment we are abundantly fortified, not only by the evidence in this case and the litigious history of tungsten but by the undisputed fact that many scientists, prominent among whom was Coolidge, had long recognized the value of tungsten wire filament and had long tried to produce ductile tungsten so that they could draw wire filaments from it. In other words, the idea of "tungsten wire" ran ahead of the production of ductile tungsten so that when ductile tungsten was finally produced the drawing of it into wire was a thing long intended and therefore obvious. We are of opinion that given ductile tungsten there is no more invention in drawing it into a wire than there is in rolling it

into a plate, pressing it into a bar, or forging it into a tube.

Claim 27 reads: "A ductile tungsten wire having a fibrous structure." Transposing the words, this claim is for (a) a wire (subject-matter) made of substantially pure and therefore of ductile tungsten, (b) having a fibrous structure (description). As the structure of ductile tungsten is fibrous, we discern no difference between this claim and the one considered at length. Product claims 24 and 27 are invalid.

Of the six product claims in suit there remain the two intermediate product claims 33 and 34 which read as follows:

"33. The material wrought tungsten, having a specific gravity of approximately 19 or greater, and capable of being forged and worked.

"34. Wrought tungsten, a solid coherent material characterized by the presence of crystals deformed by mechanical working."

Although the bill charges infringement of these claims, the defendants point out quite correctly that there is no evidence which tends to prove even remotely that they used the intermediate wrought tungsten product for their filaments. As both sides concede that the wire they used was the ultimate product, the defendants maintain that infringement of the ultimate product was not infringement of the intermediate product. Although the intermediate product is separately and specifically claimed, the plaintiff maintains that as the defendants used the ultimate product they of necessity must have used the intermediate, for without the intermediate wrought tungsten there could not have been ultimate pure tungsten. This we think is an unnecessary refinement. Clearly neither defendant used or sold vacuum tubes with filaments made of the intermediate wrought tungsten of claims 33 and 34. Their filaments were drawn tungsten, the ultimate product of other claims. If valid, neither defendant infringed the intermediate product claims by using and selling filaments not covered by them. It follows that the validity of the intermediate product claims 33 and 34 ceased to be an issue when the plaintiff failed to produce evidence of their infringement and does not call for decision. ·

We now come to the process claims. Yet "with these claims (the defendants say they) are not concerned"; that only with the product claims (24, 26, 27 and 28) "are (they) really concerned." Accordingly, the defendant Robelen Piano Company is silent as to the process claims for it is charged only with infringement of the product claims, and

the De Forest Company, evidently relying on its fact defense against the charge of contributory infringement by manufacturing wire under the process claims, has given little specific attention to the issue of their validity aside from the validity of the patent generally. The manner in which the issue of contributory infringement will be decided makes it necessary to pass on the validity of the process claims.

Coolidge was first to find a way to produce tungsten substantially pure. Was it useful? It transformed impure tungstic oxid into pure tungsten and thereby broke the bonds by which tungstic oxid had held the invaluable qualities of the metal hidden and locked through the ages and liberated them for use in two great arts. Was it new? It was, at least in so far as it had been applied to tungsten. The defendants, however, maintain and the learned trial court held that the method was old in that it had long been applied to other metals and that, holding tungsten is workable just as other metals are worked, the application of an old method to an old general problem, even when first used on a particular metal, does not involve invention. Thus it appears that the issue of the validity of the process claims of the Coolidge patent turns on the similarity of tungsten to other workable metals and the identity of the tungsten working processes of the patent with the metal working processes of the metal arts generally.

These questions must be asked and answered: Does tungsten present any problems which other metals do not present? Did Coolidge devise a method for developing the ductility inherent in tungsten which was different from methods commonly employed to develop the ductility inherent in other metals?

Tungsten, as it was known before Coolidge, was found in large quantities in many parts of the world in the form of tunstic oxid ($WO_3$). Though not found except as an oxide, it was numbered among the chemical elements under the name of Wolfram. It was, however, regarded by many scientists not as a metal but as a metalloid or semimetal. In its impure state and doubtful chemical status it resembled metals in that it was heavy, opaque and steel gray in color and it differed from many metals in that it was nonmagnetic, difficult to fuse and could not be cast, drawn into wire or reduced to plates because of its lack of true metallic texture. It was extremely hard and brittle and highly refractory. It was obtained commonly as a fine crystalline powder and had been listed with the nonductile and nonmalleable metals, either hot or cold. Before its advent in the lighting art, mainly through Just and Hanaman, it was largely, if not exclusively, used as an ingredient in the manufacture of metal alloys.

These were the characteristics of the raw material which confronted the art when Coolidge tried to get rid of them. It was with this raw material that he and his co-workers in the art had to deal. He did not devise a method for working pure tungsten for at that time pure tungsten had not been produced. He devised a method to work the raw material ($WO_3$) and from it to produce the pure metal. We think his problem was as complicated as its subject-matter was chemically complex. We also think the raw material with which he worked, though an impure metal, possessed characteristics different from those of any other metal brought to our attention. Therefore it presented problems different from the problems of other metals. Did he solve them by old methods or new?

The working of all metals by any method intended to attain malleability or ductility involves, as a condition precedent and prerequisite to any bending, forging, pressing, or drawing action, a change in the character of the crystals or grains of the metal. On this subject the record in this case contains much learning which doubtless is shared by those to whom this discussion is addressed and therefore need not be repeated here. We shall however make a brief laymanlike statement of what we understand to be an ordinary metal working in order to distinguish it from what the plaintiff regards as the extraordinary working of tungsten under the patent, both having the drawing of wire as their ultimate object.

The ordinary metal working begins with an ingot which we may assume has been cast from molten steel. This ingot—having a certain crystalline structure—is rolled, hot or cold; if hot, it is rolled at a temperature *above* the annealing temperature; if cold, it is annealed from time to time, until in every case the structure is changed and a *fine*-grained equiaxed wire rod is obtained. In order to produce a fine crystalline structure at the beginning of the wire drawing operation it is important that the finishing temperature, the temperature of the last few rolling operations, should be just *above* the annealing temperature. The result is a wire rod composed of an aggregate of *small* equiaxed grains which, as one of the experts testified, "will be recognized as the condition for maximum ductility and malleability in the metal."

In the language of the plaintiff's brief, the various processes by which mechanical work was done, and is done to-day, on the malleable and ductile metals are as follows:

"First: Hot hammering and hot rolling *above* the annealing temperature, to bring the metal into shape for some later operation, and to *reduce* the size of the grains. These operations leave the metal in a *fine*-grained, equiaxed condition, which is its most workable condition.

"Second: Hot hammering and hot rolling *below* the annealing temperature. This results in the development of fibre and 'strain hardening,' and reduces the workability, which is ordinarily restored from time to time by annealing operations. This annealing results in a *fine*-grained, equiaxed structure."

"Third: Cold hammering, rolling and drawing, at room temperature. This also results in the production of fibre and 'strain hardening,' which may be removed by annealing."

While some metals, like silver and copper, are so soft that relatively little annealing is necessary and other metals like zinc sometimes occur in such coarse crystalline condition that they are relatively unworkable until the grain has been refined by a hot working process *above* the annealing temperature, we find that the defendants have not controverted the plaintiff's analysis of general metal working processes or met its challenge that in no case in the general metal arts is there a departure in principle from the general rules stated.

What is the process of the patent? A full disclosure appears in the specification, partly quoted in the opinion of the trial court, 17 F.(2d) at page 103. We shall merely state enough of Coolidge's method of working tungsten to show it in contrast to methods of working other metals.

The process divides itself into two stages: First, the preparation of an ingot of tungsten; and, second, the working of the ingot. The preparation of a sintered ingot or rod from the powder or tungstic oxid was, we think, old and need not be described. The main characteristic of the invention consists in "the next step" which is the mechanical working. The tungsten ingot or slug, "the starting body," is at room temperature as brittle as a metal can be and is highly brittle at other temperatures. In the practice of the Coolidge process no working is done *above* the annealing temperature except for the special purpose of preventing what is called "overworking." The true working operation consists in hammering the ingot by specially devised instrumentalities in a specially defined manner at a temperature within a given range which is slightly *below* the annealing temperature of tungsten. This is a delicate operation and unless it is done as the specification directs the piece will crack; if it is properly done the crystals will be elongated. This crystalline elongation is the beginning of a fibrous structure; it is also the beginning of what in other metals would be called "strain-hardening." Instead of making the metal *less* workable, which is the characteristic of strain-hardening in other metals, this strain-hardening makes tungsten *more* workable, not at the temperature at which strain-hardening has been created, but at some lower temperature. The Coolidge process is adjusted to take advantage of this phenomenon peculiar to tungsten and which so far as we can learn is entirely new in the history of metallurgy. Moreover, throughout the whole working operation the temperature is gradually decreased. At each temperature workability at the next temperature is produced, and so on, until the metal becomes entirely ductile and workable at room temperature. Then the grains or crystals in the fibrous structure instead of being fine as in other metals are *large and long*. Moreover if at any stage of the working operation the metal is subject to a true annealing operation and thereby restored to its crystalline condition it loses all the workability which has been produced and becomes again highly brittle at room temperature. In contrasting the Coolidge method for working tungsten with the methods for working other metals having for their object the production of ductility and rendering them capable of being drawn into wire, the plaintiff makes an assertion which we think is supported by the evidence and which has not been controverted by any argument made by the defendants. It is:

"The process which brings out the ductility of tungsten destroys ductility in other metals. The condition in which tungsten is most ductile is the condition in which other metals are least ductile; the 'condition in which other metals are most ductile is the condition in which tungsten is least ductile."

Being convinced that tungsten differs from other metals in essential characteristics, that to produce ductile tungsten from impure tungsten, problems different from those incident to ductilizing other metals are present, and that to meet these problems different methods of ductilization were required and that those disclosed by Coolidge are different, new and useful in a degree amounting to in-

vention, we are constrained to hold, against the decision of the learned trial court, that all process claims of the patent which are in issue are valid except claims 14 and 16, "the additional material" and "beneficial additions" claims. These we hold invalid for lack of invention in view of the prior art.

The defendants have interposed nine distinct defenses. All save that of noninfringement are directed against the validity of the patent or certain of its claims. Three have been passed on. The manner in which the process claims have been adjudged leaves the remaining six defenses still open and available as to them. These we have considered one by one and shall briefly dispose of.

1. The Coolidge patent is invalid in view of the prior art.

As the product claims in issue have been held invalid, this contention must now be restricted to the process claims; yet "with these claims (the defendants say they) are not concerned" and accordingly have given them little direct consideration. True, the Robelen Piano Company, the retail distributor, not having been charged with their infringement, is not concerned with them, but we think the De Forest Company, the alleged contributory infringer in the manufacture, is concerned. For this reason we have given this aspect of the case as much consideration as any other and hold on the evidence and authorities that, except claims 14 and 16, the prior art does not invalidate the process claims of the patent which are in issue.

2. The process, product and intermediate product claims of the Coolidge patent are wholly invalid for want of invention in view of the fact that ductilizing molybdenum was completed and ductile molybdenum produced in the art before Coolidge.

By this argument the De Forest Company, the only defendant now interested in this case, is trying to prove one thing by another when proof of the first thing, if available, would be more convincing. It is conceded that molybdenum and tungsten are in the same family of metals but it is far from clear that, because molybdenum had been previously worked and produced ductile, it is, through the family relation, prior art to ductile tungsten. While both metals are similar in some respects they have points of difference which in our view present different problems and require different methods for producing the ultimate products with their characteristic of ductility. Much of this very heavy record is devoted to asserting and denying this statement. After a careful study of the evidence bearing on the subject we announce that as

the judgment at which we have very deliberately arrived.

3. The De Forest Company further attacks the validity of the patent on two issues of fact: (1) That if ductilizing tungsten constituted an invention it was the invention of Doctor Colin G. Fink and not that of Coolidge; or if Coolidge played a part in the ductilizing of tungsten it was a secondary part to that played by Doctor Fink, so that if Doctor Fink is not considered to be the sole inventor the most that could be claimed for Coolidge is that he was a joint inventor with Fink and that, in either case, Coolidge was not the first, sole and original inventor and therefore the patent issued to his assignee is invalid.

These alternate defenses, advanced with vigor and confidence, go directly to the validity of the patent. As they raise issues of fact in respect to which we have not been aided by the learned trial judge, who, in view of the grounds on which he based his decision, had no occasion to decide them, we have given this phase of the case very serious consideration. We find the evidence stands against Fink as either sole or joint inventor and hold the patent not invalid because issued to the wrong person.

4 and 5. Against the validity of the patent the De Forest Company has set up certain alleged statutory bars which briefly stated are that the invention was in public and commercial use and had been published by Coolidge and Fink more than two years prior to the filing date of the application, that Coolidge had obtained patents therefor in England in 1906 and 1909 more than two years prior to the filing date, and that the art prior to October 21, 1908, anticipates the invention of the patent. These defenses are supported by a lengthy recital and a technical discussion of the history of this and other patents and would disturb the validity of the patent as granted were it not for the doctrine of continuing applications which is generally recognized by the Patent Office and the courts and within the operation of which we find the patent in suit came.

6. The final defense is that the filament wire employed by the De Forest Company in the manufacture of its vacuum tubes and sold by both defendants does not infringe any of the claims of the patent.

It having been held that the two intermediate product claims fell out of the case for lack of proof of infringement and that the four ultimate product claims and the two "additional material" process claims in issue are invalid, it is only the remaining process

claims that were capable of infringement. As to them the De Forest Company alone is charged with infringement and then in the form of contributory infringement. To this charge the De Forest Company makes two defenses: First, that the material out of which its wire was made was not the product of the process claims, namely, substantially pure tungsten, but was an alloy of tungsten and theoria, an oxid of the metal thorium, arguing that it is fundamental in the metallurgical art that an *alloy* of two metals is *neither* of the metals and this is true irrespective of the relative percentages of the metals combined to make the alloy.

We have not been persuaded to this view. What this defendant is charged to have manufactured, contributorily, by the process of the patent is substantially pure tungsten and that is what its principal did manufacture by the patent process. We come to this conclusion mainly on this defendant's own admission, made when denying infringement of the intermediate product claims, that its wire was the product of the ultimate product claims and also on its admission that the wire was manufactured under the process claims of the patent. But the defendant says, even so, it did not infringe because it deliberately added thoria to the pure tungsten of the process claims and thereby produced an alloy of tungsten and thoria, a thing not made by the process claims. The constituents of the claimed alloy were about ½% by weight of thoria and 99½% of substantially pure tungsten. It was long known that the action of thoria on tungsten, mechanical rather than chemical, prevents off-setting, slipping or sliding in its fibrous structure. The mere addition to tungsten of this very small percentage of another metal leaves the tungsten substantially as it was when made and leaves its structure and the performance of its characteristics as they were before. It is not, in our opinion, a true alloy for, if every minor addition to a major metal constitutes an alloy, then all metal products would be alloys, for none is absolutely free from other metals in solution.

▮ Finally we come to the fact issue of contributory infringement. The De Forest Company maintains that it did not infringe because it went to a concern known as P. R. Mallory & Company, manufacturers of tungsten wire under a process now admitted to be the process of the patent in suit, and bought the wire over the counter as any innocent customer might purchase from stock in hand any other commodity which happened to be unlawfully made. If this position

were supported by the evidence it would be sound, but we read the evidence in a different way. The Mallory Company was making tungsten wire of a certain size. A representative of the De Forest Company called upon it and indicated that his company wanted a wire of smaller size. The Mallory Company doubted its ability to make wire of that size but on an order from the De Forest Company it tried it out and found to the surprise of its employees that it could make it. From that time until the Mallory Company ceased to make wire, this wire of smaller size was regularly ordered by the De Forest Company and regularly made by the Mallory Company in response to the orders and supplied the De Forest Company at the rate of about 100,-000 meters a month. While the evidence of these transactions is brief, it is, nevertheless, as extended as the transactions themselves, which, we think, were not casual purchases by an innocent customer but orders given for specially made wire and constitute contributory infringement.

That part of the decree of the District Court dismissing the bill as to the Robelen Piano Company on its holding that claims 14, 16, 24, 26, 27 and 28 are invalid is affirmed, and that part of the decree dismissing the bill as to the De Forest Company on its holding that claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 17, 18, 19, 20, 21, 22 and 23 are invalid is reversed with direction that as to the latter defendant the bill be reinstated and the case proceed in a manner not inconsistent with this opinion.

BUFFINGTON, Circuit Judge (concurring and dissenting). In this court's holding the process claims valid and infringed I concur. From its holding the product claims invalid I dissent. In view of the importance of the case to the litigants and of the patent principles involved, I record my views at length.

Confronted by the vast amount of testimony in this case, let me settle what is the actual thing, the issue, these parties are fighting about. It is a tungsten wire. If I bear this tungsten wire in mind it will bring to this suit the same clear light that wire brought to the electric light art. I squarely face the controversy when I say that as a new product of manufacture the patent demands an exclusive right to a tungsten wire in the varied wording of the claims, viz.: "24. A wire formed of ductile tungsten;" "26. Substantially pure tungsten having ductility and high tensile strength;" "27. A ductile tungsten wire having a fibrous structure;".

"28. A form of tungsten metal pliable at room temperature;" "33. The material wrought tungsten, having a specific gravity of approximately 19 or greater, and capable of being forged and worked;" and "34. Wrought tungsten, a solid coherent characterized by the presence of crystals deformed by mechanical working."

Taking for present purposes claim 24, "a wire formed of ductile tungsten," as the general and inclusive one for a tungsten wire and the others as descriptive of specific characteristics thereof, we have before us the simplified and decisive question here involved. Is a tungsten wire new? Second, is it useful? Third, is it inventive? Fourth, is it patentable? If the answer to any one of the four is negative, the patent falls. If the answer to all four is affirmative, the patent stands. Accordingly, we turn to the first question, was tungsten wire new? The patentee averred it was, viz. "My invention comprises a new incandescent lamp filament of drawn wire made from metal tungsten and a new process of producing the same." The grant of the claim and issue of the patent was based on this assertion that tungsten wire was new.

The prima facies of a patent, as to invention, is merely the expression of an opinion and therefore but persuasive, but the finding of novelty is one of fact and as said in Edison v. Beacon (C. C.) 54 F. 693, and cases cited, "The presumption of novelty arising from the grant of the patent is not to be overcome except upon clear and convincing proof." But the novelty of tungsten wire does not depend on presumptions in an ex parte inquiry, but upon the facts proven in this record. These show that there simply never was a tungsten wire before the patentee's, and no one avers it was not new. Other than its metallic use as an alloy, tungsten had never been treated mechanically to form anything nearer to a wire than the squirt filament of Just's patent. Indeed, so new was tungsten wire and so barren the art of any way of making it, that this patentee was awarded claims for his novel method of making his novel product. Without therefore citing the proofs, I find tungsten wire was new.

Turning to the second question, Was it useful? The defendant answers that question by using it. And the public evidence its usefulness not only by using it but using it to the exclusion of all other electric lighting filaments. Its superiority and usefulness over all filaments is proved, (a) by its capacity to furnish more light on less current; (b) by reducing the cost of light; (c) by extending the use of lights to automobiles, trolley and railroad cars; and (d) by making transportation of tungsten bulbs possible. I therefore find it was useful.

Was tungsten wire inventive in origin? I note here that I confine my inquiry to its inventive origin and do not here discuss the fourth question, Was it patentable? I think tungsten wire was an invention in discovery, an invention in conception, an invention in product. Whatever the nature of tungsten, whatever its properties, whatever its possibilities, sure it is that tungsten wire was not an outgrowth of progress in the art, for tungsten was at a standstill. No matter what experts may now theorize and say, the unbroken and prior recorded literature of disinterested journals, dictionaries, and scientists was that tungsten was not a thing of which wire could be made. Whether this literature was right or wrong, we have the patentee's daring and original step in the face of this solid wall of universal metallic belief, and from what was considered an unworkable metal he made a product then deemed impossible of production. That was the problem that confronted the patentee. In measuring what he did we rightfully start where he started, namely, with the fact of the belief of the then scientific world, and against and in the face of that belief, whether right or wrong mattered not then or now, he took the original step of his discovery. And if it be concluded now that subsequent events show that the prior beliefs of the scientific world were wrong, which I think is not the fact, it seems to me he is all the more original in standing out against such mistake and by an inventive act proving the prior fallacy of scientists. Without here detailing the grounds in support of the view that tungsten wire was an invention, it seems to me that if tungsten wire was new, as I find it was, and, if tungsten was so different in character that wire could not be made from it by any known process of the wire art, but that a new process had to be and was invented by the inventor to make the new wire, I am warranted in saying the invented process goes hand in hand with an invented product. I therefore hold the tungsten wire was an invention, and take up the fourth question, Was such invention, namely, to use the words of the claim, "a wire formed of ductile tungsten," patentable?

In considering that question, I take the words of the claim as I find them, inquire what those words mean and imply, and then ask myself the question, Is this "wire," this "formed wire," this wire "formed of tungsten," this "wire formed of ductile tungsten,"

patentable? This brings me to the basic and decisive inquiry, Do the patent laws provide for a patent for such an article as is here involved? In that regard section 4886 (35 US CA § 31) provides "Any person who has invented or discovered any new and useful * * * manufacture * * * may * * * obtain a patent therefor." It will thus be seen that the first inquiry is whether "a wire formed of ductile tungsten" is a manufacture. Now it seems to me the word "wire" in and of itself stamps this product as manufactured, and therefore a manufacture contemplated by the statute. As wire is defined "a metallic substance formed to an even thread by being passed between grooved rollers or drawn through holes in a plate of metal," the process of forming by rollers or drawing through a metal hole makes wire a manufacture, and such wire does not lose or add to its character of being a manufacture by being made or formed of "ductile tungsten." This word "ductile" has been the subject of so much testimony, theorizing and discussion that we are in danger of being misled thereby. We are concerned with the use of the word "ductile" in the literature of the art prior to the patent, for that shows its meaning in the claim. In its common, everyday meaning it means what the dictionary says, "capable of being elongated or drawn out, as into wire or threads." That, as it seems to me, was what the literature of the prior art meant when it said in effect that tungsten, in whatever form it existed, as an ore, a chip, flake, or oxide, was not capable of being "drawn out, as into wire or threads." And this, in the ordinary acceptation of words, was what such prior literature held on the subject, and, resting on that belief, it warned and told the patentee he was dealing with a metal that could not be "drawn out, as into wire or threads." To now show that the metal, by inventive process, could be "drawn out, as into wire or threads," and therefore had in it all the time the latent and dormant, but nevertheless the existent, possibility of being "drawn out, as into wire and threads," and was therefore potentially ductile, and not impotently nonductile, only serve to my mind to show the more strongly the marked originality and inventiveness this patentee displayed in giving to the public for the first time tungsten wire and the consequent advance in electric lighting.

When I consider the remarkable, if not startling, fruitage, his original thought and radical departure from preconceived scientific belief has borne, the strongest wire the world now has, the tensile strength of the metal increased thirtyfold, a brilliancy of light that has paled Edison epoch making carbon filament, I realize I am face to face with a great improvement. This whole step, its temporary reward, its protection, its monopoly is summarized in this claim, "a wire formed of ductile tungsten." Edison was the creator of electric lighting by a carbon filament. This patentee was its re-creator by a tungsten wire filament. Put the two face to face today and which light has dominion over the other? Which shall prevail? The public has answered that question by substituting the tungsten product for the carbon filament. Of Edison, Judge Colt, with prophetic eye, at the very inception of electric development, in Edison Electric Light Co. v. Boston Incandescent Lamp Co. (C. C.) 62 F. 397, said:

"The invention of Edison resides in the carbon filament; the other elements of the combination were old and subordinate, and represent, so to speak, only the environment of the filament. For this reason, I do not think the court should seek to restrict the plain meaning of the language of the claim. And there is another reason for giving the claim a broad construction. Edison made an important invention; he produced the first practical incandescent electric lamp; the patent is a pioneer in the sense of the patent law; it may be said that his invention created the art of incandescent electric lighting. Where a valuable invention has been made, the court will uphold that which was really invented, and which comes within any fair interpretation of the patentee's claim."

In stronger terms we can apply his language and the spirit of his decision to tungsten wire. If the carbon filament was a manufacture; if barbed wire was a manufacture, how can we say that tungsten wire, novel, useful, inventive, was not entitled to patent protection as a product of manufacture?

### On Petition for Rehearing.

WOOLLEY, Circuit Judge. The appellant, charging in its petition that the court misunderstood and therefore misstated certain chemical characteristics of the invention of the product claims of the patent, seeks a rehearing in the belief that a correct understanding and statement would lead the court to change its conclusions. As this is a serious criticism of a decision in an important case—made with the utmost sincerity—we have given it careful consideration. It may be that in the complexity of the subject-matter of the invention certain of our statements were not, from a scientific standpoint, precisely accurate; yet, even so, the appel-

lant has not persuaded us that our understanding of the invention of the product claims is wrong and that, accordingly, it should be corrected by a reargument.

The petition for rehearing is denied.