**HANDLEY PAGE, Limited, v. LEECH AIRCRAFT, Inc.**

District Court, S. D. New York.

Aug. 16, 1940.

Knight Brothers, Ray T. Ernst and Octavius Knight, all of New York City, for plaintiff.

Ralph J. Leibenderfer, of New York City, Fred Gerlach, of Chicago, Ill., and Alfonse F. Spiegel, of New York City, for defendant.

BONDY, District Judge.

This is a suit for infringement of U. S. Patent No. 1,422,614 issued on July 11, 1922, to the plaintiff for an invention of Frederick Handley Page. The patent expired before the case was finally submitted for decision.

The patent relates to improvements in means for balancing and regulating the lift of aircraft. The specification states: "In order to vary the relative lift of the wings on the port and starboard sides of an aeroplane flying machine to maintain the lateral stability of the said machine about the axis of flight, or to cause the lift of both wings on opposite sides of said machine to be increased, flaps or ailerons, hereafter termed flaps, are usually provided, being hinged adjacent their forward edges to the rear edges of the wings, and which flaps can be increased in angle or turned downwards as required by means operable by the pilot and which means are so well known as not to call for description in this specification, and the object of the present invention is to provide means, as hereafter described and claimed, by which the effect produced by such hinged flaps is greatly increased.

"I have ascertained, as the result of numerous experiments, that by the wing having a slot or slots through the wing structure from the under surface to the upper surface and extending in length transversely to the line of flight, the lift of such a wing can be increased by admitting air from the under side to the upper side of the wing surface by way of said slot or slots, and when the wing is flown at large angles of incidence the lifting effect is considerably increased. As a fur-

ther result of experiments I have found that the openings of the slots on the under surface of the wing structure should preferably be larger and more forwardly located than the openings on the upper surface.

"Now the present invention consists in utilizing and adapting the above mentioned method of increasing the lift, to augment the lifting effect produced by wing flaps when the latter are increased in angle or receive a downward movement about their hinges.

"According to the present invention each flap is carried by a pivot pin or equivalent hinge member, supported from the rear part of the wing, said pivot pin being so located relatively to said flap and said wing, that when said flap is increased in angle by being given a downward movement about its hinges, the forward edge or nose of said hinged flap is distanced from the rear edge of the wing, whereby a slot is automatically opened between the rear edge of said wing and the forward edge of said flap, said slot extending transversely of the line of flight and permitting of the passage of air from the under surface to the upper surface of said wing structure adjacent the forward edge of said flap while when said flap is in its normal position or turned upwards said slot is closed.".

Claims 1, 2, and 4, are at issue. Claim 1 reads as follows:

"1. In laterally balancing or regulating the lift of the wings of aeroplane flying machines; the combination with said wings, of flaps located at the rear edges of said wings, hinge members to support said flaps, and means extending from the structure of said wings to support said hinge members in such position relatively to said wings and said flaps, that a slot is formed between the forward edge of each of said flaps and the rearward edges of said wings when said flaps are turned downwards about their hinges, and said slot is closed when said flaps are in their normal or upturned positions."

Claim 2 adds to the foregoing the following: "and constructing the rearward edges of said wings adjacent the forward edges of said flaps inclined upwardly and rearwardly from the lower surface to the upper surface of said wings to produce slots larger on the under surface than on the upper surface of the structure when said flaps are turned downwards about their hinges."

Claim 4 adds to claim 1 the following: "and constructing the rearward edges of said wings adjacent the forward edges of said flaps concavely curved from the lower surface to the upper surface to produce slots having openings larger on the lower surface than on the upper surface and having the walls of said slot comprised by the rear edges of said wings and the forward edges of the flaps curved rearwardly from the under surface to the upper surface."

The patented device represents the culmination of a series of experiments by Frederick Handley Page involving the use of slots in aeroplane wings. In an effort to prevent the breakdown in the flow of air or "burbling" which was found to occur over the upper surface of an aeroplane wing when the wing was tilted upwards at a sharp angle, resulting in stalling, he had experimented with slots formed at the front edge of the wing. These slots were designed to admit air from the under surface of the wing and to eject such air over the upper surface with increased velocity, in order to prevent burbling when the critical stalling angle was reached. The opening of the slot on the under surface of the wing was wider than the exit on the upper surface and the slot converged rearwardly and upwardly. His experiments had revealed that a wing with such a front slot could be tilted much more sharply than theretofore without stalling, and that the lift value of the wing was increased substantially. Further experiments had revealed that a multi-slotted wing would enhance this effect.

While the wing with a front slot or many slots achieved increased lift which enabled an aeroplane to land at a lower speed, such increased lift was obtainable only when the wings were tilted at high angles of incidence. To land a plane tilted at such angles required a high undercarriage, with attendant disadvantages, such as increased resistance or drag in normal flight and discomfort on landing. Page thereupon attempted to apply the slot principle to the rear portion of the wing in an endeavor to increase the lift value of the wing at normal angles of flight. Experiments with a fixed slot extending through the rear part of the wing were unsuccessful. Experiments were thereafter conducted with a wing equipped with a depressed rear flap separated from the trailing edge of the wing by a lift-increasing slot of the same

shape used by Page on the front edge of the wing.

These experiments were completed September 16, 1920. They established that a lift-increasing slot between a wing and a depressed trailing-edge flap, substantially increased the lift value of the wing at normal angles of incidence, to a greater extent than was obtainable with an unslotted flap. The device enabled an aeroplane equipped therewith to land at a reduced speed, eliminated the necessity of a high undercarriage, and also provided increased lift with reduced drag for take-off. The inventor, on December 21, 1920, applied for a British patent embodying this invention. This resulted in British Patent No. 176,909, sealed June 21, 1922. On December 6, 1921, the application for the patent in suit was filed.

The charge of infringement is predicated upon the sale and use by the defendant of Stinson Reliant aeroplanes equipped with landing flaps which allegedly embody the invention claimed in the patent in suit. The Stinson Reliant aeroplane possesses ailerons, used for lateral balancing, as well as flaps, used principally for landing purposes. The plaintiff restricts its charge of infringement to the landing flaps. These flaps are connected to the main wings by hinge members and are adapted to be swung downwardly about such hinges. When the flaps are depressed, a slot is formed between the trailing edge of the main wing and the forward edge of the flap, permitting air to pass from the under surface to the upper surface of the wing structure. The slot extends upwardly and rearwardly from the under surface to the upper surface, and is wider at the entrance for the passage of air at the bottom than at the exit at the top. Since these flaps are not used as ailerons, they are not adapted to be placed in an upturned position but can only be placed in a depressed position or in normal position, when they form a prolongation of the wing. The evidence is conflicting whether there is any opening between flap and wing when the flap is in its normal position. Defendant insists that there is such a space, varying between 7/32 and 3/8 of an inch in width, and that the wing is purposely designed to provide that space in order to decrease the force required to depress the flap and permit the use of a vacuum-cylinder device for that purpose. Plaintiff insists that an examination of Stinson aeroplanes sold by the de-

fendant failed to disclose any space other than at most a clearance to avoid friction between the wing and the flap.

The defendant, seeking to avoid the charge of infringement, contends that the patent in suit must be limited to a three-position wing flap functioning as an aileron, thus excluding the defendant's two-position landing flap. The defendant contends that the drawings attached to the patent disclose a single device adapted for use in three positions as an aileron and points out that each claim expressly states that the "slot is closed when said flaps are in their normal or upturned positions", whereas the ordinary landing flap is not adapted to be upturned.

The defendant seeks to support its interpretation of the claims as limited to a three-position wing flap functioning as an aileron by a reference to the earlier British Patent No. 176,909, upon which the patent in suit is based. The specifications therein, however, state (page 3, lines 1-10): "Although this invention has been described with reference to increasing the lift of one wing or the other at will for the purpose of lateral balance, it is obvious that if both adjustable surfaces are independently adjustable, then by drawing down both adjustable surfaces simultaneously, both wings would gain in lift and a general increase in lift would be imparted to the machine." A similar statement appeared in the provisional specification (page 2, lines 11-20.).

The specification of the patent in suit reveals that the patentee clearly contemplated the application of his structure to landing flaps. In describing the state of the art, he differentiated between the aileron function of varying the relative lift of the wings in order to maintain lateral stability (page 1, lines 9-13) and the function of causing the lift of both wings on opposite sides of the machine to be increased, as when landing (page 1, lines 13-15), and stated that it was the object of his invention to provide means, "as hereafter described and claimed, by which the effect produced by such hinged flaps is greatly increased." (Page 1, lines 23-27). The claims expressly include flaps adapted for use as landing flaps as well as flaps adapted for use as ailerons. Each claim is introduced by the recital: "In laterally balancing or regulating the lift of the wings of aeroplane flying machines." The words "regulating the lift of the wings" relate to

the function of the landing flap and are not, as defendant urges, synonymous with the preceding expression. Under the defendant's interpretation, these words would be surplusage. The invention consisted of producing a lift-increasing slot between a wing and a depressed trailing-edge flap. The invention was adaptable for several uses. It could be utilized to increase the efficiency of a lift-increasing or landing flap. It could also be utilized to advantage in connection with ailerons. The patentee included both uses in his claims. The reference in the claims to the closure of the slot when the flaps are in their "upturned positions" refers to the use of the invention in connection with ailerons. The claims cover a slot and trailing-edge flap, with the slot open only when the flap is depressed and otherwise closed.

The defendant's contention that the claims do not read upon its device because they specify that the slot is closed when the flaps are in their normal position, must also be rejected. Assuming that there is a gap of between $\frac{7}{32}$ to $\frac{3}{8}$ of an inch between the landing flap and the wing of the Stinson aeroplane when the flap is in its normal position, such a deviation from the claims of the patent is not sufficiently substantial to avoid infringement.

Defendant contends that the patent, if deemed to cover a two-position landing flap, is invalid under the provisions of 35 U.S.C.A. § 32, because the patentee procured earlier British patents for the same invention and the applications therefor were filed more than a year before the filing of the application for the patent in suit. But, as the defendant itself states in its brief, the patent in suit is based upon, and claims the same invention as, British Patent No. 176,909, for which application was filed less than twelve months before application was filed for the patent in suit. The defendant's contention that earlier British patents covered the invention described and claimed in this patent therefore involves the assumption that the British patent office granted several patents for the same invention, and that the United States patent office did the same, in view of the fact that equivalent United States patents were issued for the same inventions as the earlier British patents. The defendant, however, does not contend that the patentee has been guilty of double patenting in this country by virtue of these equivalent United States patents.

The earlier British Patent No. 157,567 does not sustain the defendant's contention. This patent claims only a front slot or slots designed to permit an increase in lift when a wing is tilted at a high angle of incidence, and was the result of the patentee's early experiments.

■ The defendant's chief reliance is upon British Patents Nos. 166,428, 166,429 and 172,109. The first of these patents refers to improved means for supporting and connecting an auxiliary wing to the main wing of an aeroplane so that the adjustment of the auxiliary wing requisite to open a slot would decrease the angle of incidence of the auxiliary wing and displace it downwards and thereby increase the effective camber of the whole wing structure. The specifications include this statement: "It will be obvious that such auxiliary wings may be located in the front or at the rear of the main wing." This statement was first inserted in the complete specification filed March 16, 1921, some three months after provisional specification had been filed for British Patent No. 176,909, the predecessor of the patent in suit, and less than twelve months before application was filed for the patent in suit. Assuming that by virtue of the foregoing statement in the complete specification for British Patent No. 166,428, that patent should be construed to claim the invention of the patent in suit, it does not follow that the provisional specification must be considered as the "application" for that patent within the meaning of 35 U.S.C.A. § 32. Since the invention described in the patent in suit had not been conceived until September 16, 1920, after the provisional specification for British Patent No. 166,428 was filed and was first (if at all) imported into the proceedings relating to that patent by the complete specification, the latter should properly be considered the "application" within the meaning of the statute. American Stainless Steel Co. v. Rustless Iron Corp. of America, D.C., 2 F.Supp. 742, 752, affirmed 4 Cir., 71 F.2d 404. An identical situation exists with reference to British Patent No. 166,429.

Handley Page British Patent No. 172,109, also relied upon in this connection by the defendant, covered the multi-slotted wing which preceded the invention of the slotted trailing-edge flap. This patent does not claim the same invention as the patent in suit.

It follows that the applications for such British patents as might be deemed to claim the invention of the patent in suit were filed less than twelve months before application for the latter patent was filed.

The defendant introduced in evidence numerous prior patents issued in foreign countries and in the United States, although it gave plaintiff notice of comparatively few of these. Many of the earlier patents disclose devices for creating openings at the front of the wings only; many disclose only fixed openings in wings; others disclose types of multi-slotted wings or a tandem wing construction or teach the necessity of closing openings in the wings to attain lift for landing purposes. Some reveal depressable trailing flaps which, when lowered, extend partly above the upper surface of the main wing and many provide openings in wings totally dissimilar from that described in the patent in suit. Many do not disclose depressable trailing-edge flaps. None of the foregoing is effective to anticipate or to negative the inventive character of the patent in suit.

Of the many patents introduced by the defendant, its expert witness selected only three which in his opinion disclosed a main wing having a trailing-edge flap which could be turned downwards about a hinge creating a slot between the main wing and the flap which would increase the lift of the wing, namely, German Patent No. 296,-536 issued to Gramaticesco February 21, 1912, United States Patent No. 1,209,923 issued to Wragg December 26, 1916 and British Patent No. 167,318 issued to Duncanson and sealed November 2, 1921.

The Gramaticesco patent discloses a tandem wing construction, with the second wing shiftable upward or downward and forward or backward. There is no provision for closing the space between the two wings. The space bears no resemblance to the type of slot described by the patent in suit, nor is the second wing adapted to being depressed downwards about a hinge. Wragg Patent No. 1,209,923 also describes a tandem wing construction with a space normally between the wings, and means whereby the space may be closed and the rear wing simultaneously depressed. The patentee contemplated that the space between the two wings would be closed when it was desired to fly the aeroplane at low speed with the rear wing fully depressed and open when flying at high speed with the rear wing in its normal raised position.

The patent in suit, on the contrary, provides for opening the slot between wing and flap when the latter is depressed and high lift for slow flying speed is desired, and for the closure of the slot when the flap is in its normal position.

Plaintiff has objected to any consideration of the Duncanson British patent on the ground that it was issued subsequent to the date of invention of the patent in suit. It, however, may be noted that the opening which is created in the Duncanson device by depressing the rear part of the wing differs materially from the plaintiff's slot. The former does not present the slot-like character of the latter because in the Duncanson device the trailing edge of the main wing and the forward edge of the trailing part each comes to a point. Since there is no evidence of the effect of an opening such as that found in the Duncanson device, upon the lift value of a wing at normal angles of attack, it is speculative whether that type of opening is capable of increasing lift by conveying a stream of air from the under surface to the upper surface of the wing with increased velocity. It is doubtful whether such an opening is capable of functioning as a means of increasing lift, in view of the testimony of plaintiff's expert, a professor of aeronautics at the Massachusetts Institute of Technology, that a space between a wing and a flap, when the latter is downwardly deflected, is really detrimental, unless the space is in the form of a lift-increasing slot such as is shown in the patent in suit. None of the claims in issue reads upon Duncanson, since the word "slot", as used in the former, is not synonymous with space or gap or opening, but has reference to a channel in the wing as described in the specification and in the drawings.

The defendant in its brief urges that three other patents disclose slots formed by relative movement of trailing-edge wing sections, U. S. Patent No. 1,589,780, issued to Wragg June 22, 1926, upon an application filed November 27, 1918, U. S. Patent No. 1,293,228 issued to Sopwith February 4, 1919, and French Patent No. 406,827, issued to Arrix February 12, 1910. This Wragg patent discloses a tandem wing construction with a space between the two wings which is to be closed by depressing the rear of the trailing wing when it is desired to increase lift and permit the plane to land slowly, unlike the operation of the device described in the patent in

suit. The Sopwith patent describes a wing with a movable rear part, but the trailing portion can not be depressed. It is adapted only to be moved upwards or into neutral position as a prolongation of the wing. In neither position is there any opening disclosed for the passage of air between the two parts of the wing. The Arrix patent discloses a tandem wing construction. The rear wing can hardly be considered the equivalent of a depressable rear flap, and the patentee contemplated that the space between the wings would be closed when reduced speed was desired for landing purposes.

The court accordingly is of the opinion that claims 1, 2 and 4 of the patent in suit are valid and that they have been infringed.

Submit proposed findings of fact and conclusions of law and proposed decree in accordance herewith.