**WOBURN DEGREASING CO. OF NEW JERSEY v. SPENCER KELLOGG & SONS, Inc.**

**Civ. 452.**

District Court, W. D. New York.

Aug. 26, 1941.

See, also, D.C., 37 F.Supp. 311.

John S. Powers, of Buffalo, N. Y. (Gifford, Scull & Burgess, of New York City, of counsel), for plaintiff.

Bean, Brooks, Buckley & Bean, of Buffalo, N. Y. (Alfred M. Houghton, Lawrence E. Webster, and Harold F. Watson, all of Washington, D. C., of counsel), for defendant.

KNIGHT, District Judge.

This suit is for the infringement of U. S. Patent No. 1,892,258, issued to I. G. Farbenindustrie Aktiengesellschaft, assignee of Hanns Ufer. The only question at issue here is whether by virtue of the provisions of Section 4887 of the U. S. Revised Statutes, U.S.C.A. Title 35, § 32, the patent is invalid.

The first paragraph of that section provides that no patent shall "be declared invalid by reason of its having been first patented * * * by the inventor or his legal representatives or assigns in a foreign country, unless the application for said foreign patent was filed more than twelve months * * * prior to the filing of the application in this country." The second paragraph of the same section makes the filing date of the foreign application the effective filing date of the U. S. application, provided that the two applications are "for the same invention" and provided there are less than twelve months between their filing dates. Counsel differ as to the meaning and purpose of these paragraphs. The defendant urges that the first paragraph is purposed to "insure the expiration of a U. S. patent at a date not substantially later than the expiration date of the corresponding foreign patent". Plaintiff denies that it has any such purpose or effect. Defendant submits that the second paragraph relates only to the giving to the applicant the benefit of a foreign filing date for the purposes of a priority contest, or to enable him to overcome a publication. The plaintiff takes issue with this and urges that the two paragraphs are in effect different expressions of the same thing. However, the question of any difference in any way in the effect of these two sections makes no difference with the conclusions herein made.

The patent in suit, No. 1,892,258, was issued December 27, 1932, on application S. N. 421,596, filed January 17, 1930. The claim here made is that it is invalid under section 4887, supra, in view of the German Patent No. 529,557, asserted to be for the same invention, patented in a foreign country, by the U. S. inventor's representatives or assigns, and for which the application was filed more than twelve months prior to the filing of the application for the U. S. Patent No. 1,892,258.

The critical questions to be determined here are whether the United States Patent and the German Patent are for the same invention and when the effective filing date of the application for the German Patent was.

The first German application with which we are concerned is S.N. I 35,266, filed August 15, 1928. An amendment adding Example 3 was filed January 24, 1929, an amendment adding Examples 4 and 5 and Claim 3 was filed December 20, 1929, and amendment re-writing the specification, adding Example 6 and omitting Claims 2 and 3, was filed July 29, 1930, and the publication of the grant as No. 529,557 made July 2, 1931.

On December 20, 1929, the same date on which the patentee filed his second amendment to the application of August 15, 1928, a second German application No. S.N. I 40,202 was filed. This second German application was not prosecuted to a patent. On July 15, 1929, or within twelve months from the date of the filing of the original application S.N. I 35,266, Ufer U.S. application S.N. 378,586, was filed. This application was abandoned. The application for the patent in suit states that it is a

continuation in part of the application Serial No. S.N. 378,586.

The subject matters of concern here are processes for the modification of castor oil—one to make it soluble or miscible with mineral oil and usable as a lubricant, and one to make a drying oil, such as might be used in the paint and varnish arts as a drier, as is linseed oil. Castor oil, as such, is not a lubricant nor is it a drying oil. Though there is no water in castor oil, the modification processes are said to be obtained by "dehydration". By treatment with certain catalysts the chemical structure is changed in this process and water is formed which passes off as steam. Castor oil contains hydroxyl groups and hydrogen. If one of the hydroxyl groups, with a corresponding hydrogen atom, is split off through the action of the catalyst in the process employed, castor oil miscible with mineral oil is formed; if all, or three of the hydroxyl groups with the hydrogen atoms, are split off, a drying oil is produced.

■ Is the U. S. Patent No. 1,892,258 for the same invention as the German Patent No. 529,557? It is thought it is. The title of Ufer U. S. Patent No. 1,892,-258 is "Improvement in the Production of Modified Castor Oil." The title of the German Patent No. 529,557 is "Process for the production of oils soluble in mineral oils from castor oil." Both state that the modification is affected by heating in the presence of certain compounds which serve as catalysts; all the catalysts mentioned in the German patent, except sulfuric acid, are found in the suit patent; both patents state that upon continuing the heating of the castor oil with the catalysts, further modification takes place and an oil with drying properties results. Both patents set out certain examples which are substantially identical. Both patents disclose that by heating with the catalysts under certain conditions castor oil is dehydrated and water evolved; that when from two to three per cent of the weight of the oil has been distilled off in this manner, castor oil is generally miscible with mineral oil; if heating is continued 3 molecular proportions of water can be removed from each molecular proportion of castor oil and drying oil can be produced; that the treatment is most effective if conducted under vacuum or flow of gas; that the operating temperature is under 350° C. The catalysts employed in the U. S. patent are described as "acid compounds of the non-oxidizing mineral acids containing oxygen" and suitable catalysts are specifically indicated in the examples of the patent. The German patent includes compounds of non-oxidizing mineral acids as to another type of catalysts. The German patent includes a single claim. It is broader than the suit patent. It includes as catalysts the acid compounds described in the U. S. patent and also the oxides which are not disclosed in the latter patent. The patent in suit includes only acid and acid compounds of certain types. Both describe with comparable likeness the method of the use of the materials, the kind and the amount.

■ Obviously, these patents are not identical. It is not necessary that they be. Sawyer Spindle Co. v. Carpenter, C. C., 133 F. 238; Commercial Acetylene Co. v. Searchlight Gas Co., D. C., 197 F. 908; Siemens v. Sellers (Guarantee Ins. Trust & Save-Deposit Co. v. Sellers), 123 U.S. 276, 8 S.Ct. 117, 31 L.Ed. 153. The test is whether the United States patent would be infringed by the German patent. Commercial Mfg. Co. v. Fairbank Canning Co., 135 U.S. 176, 10 S.Ct. 718, 34 L.Ed. 88.

■ The heading to the United States patent includes this statement: "Application filed January 17, 1930, Serial No. 421,-596, and in Germany August 15, 1928." The first paragraph of the United States patent reads: "Application has been filed in Germany August 15, 1928." The German patent in the specifications reads: "Be it known that I, Hanns Ufer, * * * have invented new and useful improvements in production of modified castor oil, for which I have filed application in Germany I 35,266 August 15, 1928", and it further reads: "Application has been filed in Germany August 15, 1928." While not conclusive, these statements are significant as to the understanding of the patentee that the patents were the same.

Is there continuity between the first United States application S.N. 378,586 and the application for the patent in suit? If so, the patent in suit is entitled to the benefit of the filing date of the first United States application, and this filing date would be within twelve months of the filing of the original German application.

The patent in suit recites that "the present application is a continuation in part

of the application Ser. No. 378,586, filed July 15, 1929." The disclosure of the first United States application was, in general, the same as that of the original German application. Such disclosure was a process for the production of a modified castor oil miscible with mineral oil. The process involved heating of castor oil both with the oxide type of catalyst and in addition with other compounds. The oxides mentioned as catalysts include aluminum, tungsten, titanium, zirconium, chromium, molybdenum, etc. The "other compounds" mentioned are sulphates, phosphates, silicates, "and the like." The United States patent named the catalysts to be employed as "acid compounds of the non-oxidizing mineral acids containing oxygen, preferably while avoiding the presence of water." It is the claim of the plaintiff that United States application on which the patent was issued is a continuation of the first United States application, which was abandoned, because in the first of the two applications the applicant, as in the first German application, named specific hydrating catalysts which would come within the class of "acid compounds of non-oxidizing mineral acids containing oxygen." It is the plaintiff's claim that the claims of the patent in suit, except 8 to 11, inclusive, and 14, are directly readable on the first United States application and, also, the first German application. It is the contention of the plaintiff that "tungsten oxide", "molybdenum oxide" and "primary sodium phosphate", named in the last-mentioned application, come within the acid compound group, as distinguished from the neutral substance group of such applications.

As showing continuity, the plaintiff further points out that both the patent in suit and the first United States application disclose a process "for the production of modified castor oil"; that in such process "a few percent of weight of oil" of the acid compound is used and that there is the same limitation "in the absence of substantial quantity of an oxidizing agent" and the same method of evacuating the re-action chamber to carry off the water, as steam, and other voluble substances. In my opinion, it is only necessary to determine whether, in the first instance, the first United States application contains any "acid compounds of non-oxidizing mineral acids containing oxygen", and, if so, whether such content makes continuity. There is a sharp conflict as to whether the

catalysts, to wit: oxide tungsten, molybdenum and primary sodium phosphate, are acid compounds of the type described. It seems clear to me that the applicant in his first United States application did not intend to and did not have in mind the use of any acid catalysts in his process. As pointed out, this first application followed closely the first German application. It was filed on July 15, 1929, prior to the addition of Examples 4, 5 and 6 to the first German application, on December 20, 1929. These examples for the first time described the use of acid catalysts as distinguished from the oxide. In July, 1929, the patentee had no conception of the use of acid catalysts; in December, 1929, he first showed such use. No claim in the first United States application specifically mentions acid catalysts. The process employed in such first United States application involved the heating of castor oil with catalysts of the type mentioned in the first three examples of the German Patent No. 529,557.

The three catalysts mentioned are not distinguished from the other oxide catalysts in the application. It is not claimed that a tungsten oxide or molybdenum oxide is a salt or an acid ester, but that it is an acid compound. Plaintiff's expert testified that both these oxides "re-act with bases and some re-act with acids"; that tungsten oxide does not contain any replaceable hydrogen and that an acid as generally considered must contain replaceable hydrogen. He distinguishes acid from an acid compound in that the latter becomes, in effect, acid when it comes in contact with water. But this patent specifies that its process is conducted, preferably, while avoiding the presence of water, and the record does not sustain the claim that these oxides form acids in oil at the temperature substantially above the boiling point at which it appears that water during dehydration comes off in the form of steam. The evidence discloses, as I construe it, that neither molybdenum oxide nor tungsten oxide, if coming strictly within the definition of an acid compound, meets the requirement of the first United States application. In the recognized "Text Book of Inorganic Chemistry", the statement is made that "molybdenum trioxide is an acidic oxide which dissolves in water yielding a solution of molybdic acids and combines with basic oxides yielding molybdates." This definition is not in conflict

with the view that molybdenum oxide is an acid compound within the contemplation of the first United States application.

Primary sodium phosphate concededly contains replaceable hydrogen. Its use in the first United States application is described as an alternative for the use of bauxite. So used it is coated on pumice and employed in the process at temperatures of 270° to 290° C. or about 540° to 570°F. There seems to be no question that primary sodium phosphate is converted to sodium metaphosphate and does not contain replaceable hydrogen, when heated to a certain temperature. At the temperature given for the use of bauxite in Example 2, the primary sodium phosphate is converted into sodium phosphate which contains no replaceable hydrogen and is not an acid compound as defined in the patent. Plaintiff says that the first United States application stated in general that applicant's operating temperature ranged from 150° C. to 350° C.—or 300° F. to 600° F., which is between the charge over given by defendant from primary sodium phosphate. I think defendant properly employed the temperature used with bauxite as an oxide. At any rate, as bearing on the question of continuity I think the test made by the plaintiff should be accepted as the right one.

It is urged that a finding that the patents are for the same invention compels a finding that the patent in suit and the first United States application are in continuity, because the claims of the first United States application and the claims of the German patent are the same. This does not follow. A distinction is to be made between what the claims are as shown by the examples. The first United States application does not show any example of the process to produce a drying oil. The application did not show the use of any acid catalysts or acid compounds of mineral acid containing oxygen nor does it in any way describe or show the purpose of the process or purposes claimed in the patent in suit.

It is to be noted that the patent in suit recites that it is "a continuation in part" only of the first United States application.

It is my opinion that the patent in suit is not a continuation of the United States application S. N. 378,586.

Next we come to the question of whether the amendments filed to the German patent are to be construed as applications within the meaning of Section 4887, supra. The original German application I 35,266 filed August 15, 1928, contained two examples and two claims. Claim 1 covered broadly the use of dehydrating catalysts to produce castor oil soluble in mineral oil, and Claim 2 covered the use of the oil obtained by process of Claim 1 of that mixture with mineral oils as a lubricant. The application contained no disclosure for the production of drying oils, nor did the examples. The amendment of January 24, 1929, simply added Example 3, which covered the use of titanium oxide as a catalyst. Added by the amendment of December 20, 1929, Examples 4 and 5 showed a process for making a drying oil from the treatment of castor oil with certain catalysts. Claim 3 was stricken because it referred to the use of a product and not its production. On July 29, 1929, the application was again amended, omitting claims 2 and 3 and including Example 6, which covered a method of using phosphoric acid as a catalyst. This left a single claim which was essentially the same as in the application which was originally filed. This claim is the claim of the German Patent. It is quite clear that the insertion of these amendments does not change the scope or the coverage of the German claim because of its breadth.

It is presumed that everything which appears in the German patent was filed on the filing or application date appearing on the face of the patent. Such presumption may be overcome, and it is here overcome, if the filing of an amendment has the effect of filing an application within the meaning of Section 4887, supra. Experts have testified on either side as respects the applicable German Law. I think the weight of the proof establishes that under the German Law, where an amendment has been added to an application showing disclosures not claimed, but within the first application, the application filing date is the day the amended application was filed. In other words, it carries forward the original application filing date to the date of the filing of the amendment. It is quite true that the latter date would not have priority over inventions disclosing the subject matter of the amendment before the filing date of the amendment. That, however, does not affect the question of the application filing date as it relates to the period of limitation fixed

in Section 4887, supra. The rule of the patent law is stated in German publications of authority and decisions of the German courts. Issay "Patent Law", published in Germany in 1911, makes this statement: "As soon, however, as * * an amendment is concerned, which converts the former (disclosure) from which an inventive element was missing, into an invention, it is only upon the receipt of the alteration (by the Patent Office) that the complete invention and its application are present and the priority dates from this date." To the same effect is Seligsohn "Patent Law", published in Germany in 1906. The latter states with reference to the time fixed as the date of the filing of the application that: "The decisive thing therefore is on what day the invention was brought to the knowledge of the Patent Office in such form that its identity can be determined." In Reichtsgerichts January 16, 1940, File I 175/38 (RPA) seems in point. There the court treated the claims as though the application had been filed on the day the amendment was made. In Muster und Zeichenwessen 1897, Blatt fur Patent, the court held that the date when the new invention was asserted, or the time when it was brought to the knowledge of the Patent Office in a legally prescribed manner, was the date of the filing of the application. It was there stated: "Accordingly, the Imperial Patent Office assumed wholly correctly that it is not the day of the first application, viz: —May 12, 1892, but the previously mentioned January 10, 1893 is determinative of the question whether the invention of the defendant was new." There, as here, the new matter was shown for the first time in the amended application. Authority for the view here taken is found in the United States Courts. American Stainless Steel Co. v. Rustless Iron Corp., D. C. 1933, 2 F.Supp. 742, affirmed, 4 Cir., 71 F.2d 404; Handley Page, Ltd. v. Leech Aircraft, Inc., D.C., 35 F.Supp. 856. One question involved in American Stainless Steel Co. v. Rustless Iron Corp., supra, was whether for the purpose of determining the twelve months' limitation the application filing date of foreign patent ran from the date of the filing of British provisional specification, or the date of the filing of the complete specification. It was there held that the latter date controlled. The language of the opinion with respect to this is not obiter as claimed by the defendant. It presented one of the issues decided. The language in the opinion of Handley Page, Ltd. v. Leech Aircraft, Inc., supra, supports this view. This likewise involved a British patent. In these cases it is stated that the patent in suit had not been conceived until after the provisional specification was filed.

Although, as I believe, the decision with reference to this question did not turn on this point, the judge viewed the situation as it would be viewed here. The natural inference here, as there, is that Ufer had not conceived the invention of making a drying oil until the second German application was filed. A reading of the opinion in the American Stainless Steel Company, supra [2 F.Supp. 754], as it relates to the subject matter here, shows clearly that the court based its decision upon the fact that the process or device was "described for the first time in the final specification with such definiteness as to make it patentable in this country." It is further said: "Then, since filing this specification would be, under the English Law, the proper formal step toward securing a patent, it would not be unreasonable to treat such filing as an 'application,' in the sense that word is used in Rev.Stat. § 4887 [35 U.S.C.A. § 32]. Such is the situation in the present case. The contrary construction, urged by defendant, is, we feel, unreasonably technical and harsh, and not consonant with the underlying spirit of our patent laws."

The defendant finds support for its claim that the original date of the filing of the application is the one upon which the limitation period begins to run in In re Swinburne, 19 App.D.C. 565, and In re Bastian and Salisbury, 44 App.D.C. 425. In the former of these two cases it was held that "the time of filing an application * * * in the British Patent Office * * accompanied only by a provisional specification, must * * * be taken as the date of the application for a foreign patent, within the meaning of Sec. 4887, R.S. * * *" In the Stainless Steel case the question of new matter was involved. In the Swinburne case it was not. It is this distinction in these cases which it is believed Judge Coleman had in mind when he said: "We agree with the construction placed upon the British law by the Court of Appeals for the District of Columbia, namely, that under the British law the application dates from the time of its original

filing, simultaneously with the filing of the provisional specification. [Citing cases] But we cannot concede that the construction placed by the Court of Appeals of the District of Columbia upon section 4887 of the Revised Statutes is correct, to the extent that the bar of the statute begins to run from the date of the filing of a foreign provisional specification which ripens into a patent disclosing the subject-matter of the claim upon which a domestic patent is sought, if applied to the present facts." And further: "An English preliminary or provisional specification might well be so vague and incomplete that its filing could in no way amount to what we, under the American law, understand to be an 'application.' An English final or complete specification might well be so different from the preliminary specification as to be considered under our law a new 'application,' and still be, under the English procedure, merely a completing of the record." The German law has no provisional filing.

While the Bastian case follows the Swinburne case with respect to the time that the bar of the statute begins to run, it is to be noted that no attention is given to the British Patent Act of 1907. That provided that the claim for the additional invention included in the complete specification is to be treated as an application for that invention made as of the date when the complete specification was left. The Bastian case is to be distinguished from the Swinburne case in that in the Bastian case it was urged that the provisional application did not disclose the subject matter of the claims then on appeal, while as stated in the Swinburne case, no question of new matter was involved.

Upon an issue of invalidity, such as is raised here, a heavy burden rests upon the defendant. So far as now appears, Ufer was the inventor of the processes both for making a lubricating and drying oil as described in the applications, amendments and patents. He was the inventor of a process patented in the foreign country and in the United States. Although, as has been said, the defense of invalidity such as stated here "does not appeal strongly to the conscience of a court of equity" and "no one can examine the course of judicial decision upon the subject without being impressed with the fact that the courts have sought to construe it liberally and have seldom, except in the plainest cases, permitted it to defeat a valuable patent" (Brush Electrical Co. v. Electrical Accumulator Co., C.C., 47 F. 48, 55), it seems to me that the decision here is safely based upon the ground that the limitation begins to run from the time when new matter not disclosed in the original application is set out in an amendment to the original application.

It is accordingly my opinion that the United States Patent in suit is not invalid under Section 4887 of the U. S. Revised Statutes.